JAMES, J., for the Court:
¶ 1. Following a jury trial, Certis Ratliff Sr. was convicted of sexual battery, sentenced to thirty years in the custody of the Mississippi Department of Corrections (MDOC), and fined $5,000. Ratliffs appellate counsel filed a Lindsey[1] brief certifying to this Court that there were no appealable issues in the record. Nonetheless, Ratliff has filed a pro se brief raising the following issues: (1) whether the State engaged in prosecutorial misconduct during the trial; (2) whether the trial court erred in failing to grant a continuance or a mistrial based on an amended DNA analysis that was excluded by the trial court; and (3) whether Ratliff received ineffective assistance of appellate counsel. Finding no error, we affirm.
FACTS
¶ 2. In March 2009, T.M.,[2] a sixteen-year-old female child, informed her aunt that she had been sexually assaulted by *844 her uncle, Ratliff, in November 2008. According to T.M., she did not report the incident at the time because she was nervous and ashamed and because Ratliff threatened to kill her if she told anyone about the sexual assault. However, she decided to tell her aunt in March 2009, because T.M. believed she was pregnant as a result of the sexual assault. T.M.’s aunt administered' a pregnancy test and confirmed that T.M. was pregnant; she then contacted the police.
¶ 3. The investigation was assigned to Detective Robert Holmes of the McComb Police Department. After meeting with T.M., Detective Holmes interviewed Ratliff on April 1, 2009. During the interview, Ratliff denied wrongdoing and consented to provide a DNA sample. Detective Holmes then obtained DNA from Ratliff by swabbing his mouth.
¶4. On June 9, 2009, T.M. underwent an emergency Caesarean section (“C-section”) at the University of Mississippi Medical Center in Jackson, Mississippi, and the child was delivered prematurely; as a result, the child expired at birth. Robin Russum, a labor and delivery nurse who participated in the C-section, obtained DNA blood samples from both T.M. and the deceased child. That same day, Detective Holmes retrieved the blood samples from Russum. Detective Holmes then gave the DNA sample obtained from Rat-liffs mouth and the blood samples from T.M. and her child to Sergeant John Leu-thauser, who transported the samples to Scales Biolabs (“Scales”) for forensic testing.
¶ 5. Kathryn Rodgers, a forensic DNA analyst at Scales, performed a paternity analysis by comparing Ratliffs" DNA profile from his sample with the blood samples from T.M. and the child. The results of the paternity analysis revealed a combined paternity index of 658,604 to 1, which equates to a 99.99 percent probability of paternity. The results of the DNA analysis were reflected in a DNA report prepared by Scales, dated June 17, 2009, and provided to Ratliff during discovery.
¶ 6. On July 2, 2009, Ratliff was indicted by a Pike County grand jury on one count of sexual battery of a child under the age of eighteen. Ratliff filed an affidavit of indigency and an application for appointment of counsel. On August 3, 2009, the trial court ordered that Ratliff be represented by appointed counsel.
¶ 7. On June 15, 2010, the trial court granted Ratliffs motion for funds to employ the services of a DNA expert. On October 4, 2011, the State sent Ratliffs counsel an amended DNA report. The October 4, 2011 report amended the spelling of the victim’s last name, which was misspelled in the June 17, 2009 report due to a typographical error. On October 11, 2011, the day before trial, the State notified Ratliffs counsel that Scales had furnished the State with another amended DNA report (“second amended report”). The second amended report sought to amend the combined paternity index from 658,604 to 1, which was reflected in both the June 17, 2009 and October 4, 2011 reports, to 1,422,586 to 1.
¶ 8. A jury trial was held on October 12-13, 2011. On the morning of trial, Ratliff filed a motion in limine, seeking to have the second amended report excluded from evidence. The trial court granted Ratliffs motion, ruling that the second amended report could not be used or referenced during the trial. Ratliff then requested a continuance, asserting that the second amended report contained errors that raised questions about the adequacy of the testing procedures ■ and policies at Scales and that his expert needed time to review the second amended report. The trial *845 court took Ratliffs motion under advisement until after the State’s case-in-chief.
¶ 9. T.M. testified that Ratliff was her uncle, lived two trailers away from T.M., and often visited her home. She further testified that she had known Ratliff her entire life and had lived with him for an extended period when she was seven or eight years old. T.M. testified that in November 2008, Ratliff picked her up from her home and took her to a grocery store in McComb, Mississippi, then to a McDonald’s drive-thru. After leaving the drive-thru, Ratliff drove T.M. to a park by the train tracks in McComb, where he sexually assaulted her. According to T.M., Ratliff told her, “I’m gonna get your sister if I don’t get you,” and Ratliff then “pulled me over to the driver’s side, and then he put his penis in me. I was hollering. Then when he got through, I got in the back seat, pulled my clothes up, and went home.” The event lasted approximately one hour. T.M. stated that Ratliff told her that he would kill her if she told anyone about the incident.
¶ 10. T.M.’s aunt testified about T.M.’s disclosure to her and the events immediately thereafter. Detective Holmes and Sergeant Leuthauser testified as to their roles in the investigation. Russum testified to the events surrounding the birth of the child and acquiring the DNA blood samples from T.M. and the deceased child. Rogers testified as to the October 4, 2011 DNA report, which indicated a combined paternity index from 658,604 to 1 and a 99.99 percent probability of paternity.
¶ 11. At the close of the State’s case-in-chief, Ratliff renewed his earlier motion and asked that the trial court grant a mistrial due to the questions raised by the second amended report. In support of his motion, Ratliff’s DNA expert, Anne Montgomery, testified outside the presence of the jury. Montgomery testified that the second amended report, which the trial court excluded, contained the correct paternity index values but incorrectly multiplied them to arrive at the combined paternity index of 1,422,586 to 1. Montgomery stated that this error raised questions, in her mind, about the adequacy of the technical-review procedures at Scales. However, Montgomery did not dispute the accuracy of the three DNA profiles used by Scales, and she agreed with the conclusion in the June 17, 2009 and October 4, 2011 reports.
¶ 12. The trial court denied Ratliffs motion for a mistrial, noting that the court had excluded the second amended report at Ratliffs request, and “the defensefs] expert ... testified that there is no problem with the test that was done.”
¶ 18. Montgomery testified on Ratliffs behalf, expressing her concerns about Scales’s technical review process. Ratliff testified on his own behalf. Ratliff denied sexually assaulting T.M. and claimed that T.M.’s aunt lied because she harbored ill will toward him. Ratliff also testified that Detective Holmes did not like him and, in 2004, Detective Holmes, then working as a security guard at an apartment complex, had Ratliff evicted from the apartments.
¶ 14. The jury found Ratliff guilty of one count of sexual battery. Ratliff was sentenced to thirty years in the custody of the MDOC and ordered to pay a fine of $5,000. Ratliff filed a motion for a new trial or, in the alternative, a judgment notwithstanding the verdict (JNOV), which the trial court denied. Ratliff now appeals.
DISCUSSION
I. Lindsey Brief
¶ 15. “When appellate counsel believes there [are] no meritorious issues upon which to mount an appeal, the procedure outlined in Lindsey[, 939 So.2d at 748 (¶ 18),] must be followed.” Havard v. *846 State, 94 So.3d 229, 234 (¶ 10) (Miss.2012). In order to comply, “[a]ppellate counsel must ‘file and serve a brief in compliance with Mississippi Rule of Appellate Procedure 28’ and certify to the court [that] a diligent review of the procedural and factual history of the criminal action has taken place and that ‘there are no arguable issues supporting the client’s appeal.’ ” Id. (quoting Lindsey, 939 So.2d at 748 (¶ 18)). Appellate counsel must specifically examine:
(a) the reason for the arrest and circumstances surrounding the arrest; (b) any possible -violations of the client’s right to counsel; (c) the entire trial transcript; (d) all rulings of the trial court; (e) possible prosecutorial misconduct; (f) all jury instructions; (g) all exhibits, whether admitted into evidence or not; and (h) possible misapplication of the law in sentencing.
Id. Appellate counsel must then “transmit a copy of the appellant’s brief to the client, inform him or her of the findings, and explain his or her right to file an appellate brief pro se.” Id. Once all the briefs are filed, this Court shall evaluate the case on its merits and render an opinion. Id.
¶ 16. As noted above, this case is before us on direct appeal. Hunter Aikens, Rat-liffs appellate counsel,[3] has certified to this Court that he has followed the required procedure set forth in Lindsey, and we find that no additional briefing is required of him. However, Ratliff has filed a pro se brief; therefore, we will address Ratliffs assignments of error.
II. Whether the State engaged in prosecutorial misconduct during the trial.
¶ 17. Ratliff argues that the State committed “prosecutorial misconduct” during its presentation of the case. Particularly, Ratliff asserts that, on two occasions during the State’s direct examination of T.M., the prosecutor used a term of endearment. According to Ratliff, this “inflame[d] the jury and create[d] prejudice ... towards Ratliff,” giving the jury “an impression that the victim [was] helpless, innocent, pure, blameless, and unsuspicious.” We disagree.
¶ 18. Specifically, Ratliff complains of the State’s use of the term “baby” several times during the State’s direct examination of T.M. Early on in the State’s examination of T.M., the prosecutor said: “Would you just point to him, baby,” and “[T.M.,] how old are you, baby?” Ratliffs trial counsel was granted a sidebar where he requested that the trial court instruct the State to refrain from using terms of endearment. The trial court responded: “Well, I mean, certainly I would ... instruct him [not] to do that, but I will note that the witness is ... somewhat reluctant or ... bashful, [and] shy_” The State refrained from using the term for the majority of the examination. However, later when T.M. began testifying about the sexual assault, the State again used the term in the following way: “Okay ... I know it’s hard, baby, but if you would tell us what happened when you got to the train tracks.” And again, directly after T.M. recounted the sexual assault, the prosecutor stated: “Okay ... baby, and I know this is hard for you, but you said he started pulling on you?”
¶ 19. The issue of whether a prosecutor’s comments constitute misconduct often arises in the context of opening *847 statements and closing arguments. The Mississippi Supreme Court has held: “Attorneys are allowed a wide latitude in arguing their cases to the jury. However, prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.” Tate v. State, 20 So.3d 623, 629 (¶14) (Miss.2009). Furthermore, “any allegedly improper prose-cutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety.” Ahmad v. State, 603 So.2d 843, 846 (Miss.1992).
¶20. It is clear from the context that the term “baby” was not used in a calculated way to influence the jury; instead, the term was used as an attempt to elicit testimony from a reluctant witness testifying about a difficult and sensitive subject matter. Although we could conceive of a situation in which a prosecutor’s use of a term of endearment in reference to a victim could rise to such a level as to constitute misconduct, considering the context in which the term was used here, we find its use was not inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. Accordingly, this issue is without merit.
III. Whether the trial court erred in failing to grant a continuance or a mistrial based on the second amended report.
¶21. Ratliff next argues that the trial court erred in failing to grant a continuance or a mistrial due to the existence of the second amended report. We review a trial court’s decision to admit or exclude evidence for an abuse of discretion. Williams v. State, 54 So.3d 212, 213 (¶ 5) (Miss.2011). “The trial court’s decision will stand unless the reviewing court concludes that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion.” Id.
¶22. Ratliff argues that the second amended report “created a doubt [as to the accuracy] of the original test” and that he was denied the opportunity to cross-examine the State’s expert witness regarding the miscalculations in the second amended report. We disagree.
¶ 23. As noted above, the day before the trial, the State provided Ratliff with the second amended report, which contained a miscalculation that changed the combined paternity index from 658,604 to 1, which was reflected in both the June 17, 2009 and October 4, 2011 reports, to 1,422,-586 to 1. On the morning of trial, Ratliff moved to exclude the second amended report due to its untimely disclosure, which the trial court granted. Ratliff then requested a continuance asserting that the errors in the second amended report raised questions as to Scales’s testing procedures and policies and that his expert needed time to review the second amended report.’ The trial court took the motion under consideration. After the State rested, Ratliff moved for a mistrial, which the trial court denied.
¶ 24. We first note that, although Ratliff now argues that he was not aware of the error in the second amended report until after the State’s case-in-chief, Rat-liffs motion in limine, filed on the morning of trial seeking to exclude the report, was based, in part, on the suspected errors in the second amended report. In his motion, Ratliff stated that the second amended report “more than doubled the likelihood of accuracy but somehow did not change the probability of paternity.” Ratliff further argued that “[t]he court’s only recourse is to not allow the [second amended report] to be introduced at trial ... and to prohibit the State from eliciting any testimony or other evidence based on *848 Scales[’s] research because it is now known to be unreliable.” Therefore, it is clear that Ratliff knew or suspected that the second amended report contained errors prior to the State’s case-in-chief, and prior to the State’s expert witness taking the stand.
¶25. Nevertheless, nothing prevented Ratliff from attempting to bring this matter to the jury’s attention by recalling the State’s expert and attempting to impeach her using the second amended report, or by eliciting testimony about the error from his own expert witness. Although Ratliff himself successfully moved to have the second amended report excluded, Ratliff did not attempt to use the report to impeach the State’s expert. And although Ratliffs expert may or may not have known the nature of the error at the beginning of trial, it is clear from Montgomery’s proffered testimony during the hearing on Ratliffs motion for a mistrial that Ratliffs expert knew the nature of the error during Ratliffs presentation of his case. Nothing prevented Ratliff from eliciting testimony from his expert as to her concerns about Scales’s accuracy, or from recalling the State’s expert and attempting to impeach her credibility using the second amended report. Ratliff recognized this same fact during the hearing on his motion for a JNOV. During the hearing, Ratliff again argued that his expert did not have time to “figure out that the [second amended report] was in error until after [the State’s] expert had been called and dismissed.” According to Ratliff, “that would have been material for cross-examination had we been able to discover it prior to [the State’s expert] being called as a witness.” Then the following exchange occurred between the trial court and Ratliffs trial counsel:
BY THE COURT: Well, you had an expert.
BY [COUNSEL]: We did .... [S]he just did not have time to figure out [that] the [second amended report] was in error until after [the State’s] expert had been called and dismissed. We found out ... I don’t want to misstate. I don’t recall for sure, but we either covered it, or had the opportunity to cover it when we called our own expert, but we did not have the opportunity to cross-examine their expert about it without recalling her.
BY THE COURT: Did you try to recall her?
BY [COUNSEL]: We — strategically, we decided not to do that[,] ... but had we had the information available when she was initially on the stand, we probably would have used it. That’s ... one basis for this motion.
Thus, nothing prevented Ratliff from eliciting testimony regarding the report from his expert, or recalling the State’s expert, and Ratliffs decision not to recall the State’s expert, in light of the second amended report, was strategic.
¶26. The evidence that Ratliff complains of was excluded on Ratliffs own motion. The second amended report was never before the jury, and Ratliff did not suffer any prejudice due to the mere existence of the report. Furthermore, Ratliff had the opportunity to recall the State’s expert and attempt to impeach her using the second amended report and strategically chose not to do so. We find that the trial court’s decision not to grant a continuance or a mistrial was neither arbitrary nor clearly erroneous; therefore, the trial court did not abuse its discretion. Accordingly, this issue is without merit.
IV. Whether Ratliffs appellate counsel was ineffective.
¶27. Finally, Ratliff argues that he was, or is, being denied effective assistance *849 of appellate counsel. Ratliff asserts that his appellate counsel failed to consult with him in person regarding the issues on direct appeal. We find that Ratliffs claim of ineffective assistance of appellate counsel is not ripe for appellate review.
¶ 28. In order to establish ineffective assistance of counsel, Ratliff must satisfy the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Mississippi Supreme Court in Stringer v. State, 454 So.2d 468, 476-77 (Miss.1984). Tyler v. State, 19 So.3d 663, 671 (¶ 35) (Miss.2009). Thus, Ratliff must demonstrate: “(1) that his counsel’s performance was deficient (fell below the objective standard of reasonableness), and (2) that the deficiency prejudiced his defense.” Id. “The standard for considering ineffective assistance of counsel is the same for appellate performance as it is for trial performance.” Id. (quoting Culberson v. State, 580 So.2d 1136, 1139 (Miss.1990)).
¶29. On appeal, Ratliff is represented by appointed counsel. Ratliff claims that he was, or is being, denied “the right to fairly present his claims [because] ... he was never afforded an opportunity to consult with [appellate] counsel.” Ratliff states that he wrote letters to his appellate counsel requesting a face-to-face meeting so that “issues pertaining to [the] minor child and [the] sexual battery charge could be addressed in private.” Ratliff further states that he “had issues to present known only to him.”
¶ 30. This assignment of error is premature because Ratliffs claim involves representation that is still ongoing and pending before this Court. Addressing this issue at this stage would be improper because Ratliff has yet to suffer the alleged prejudice that he complains of, pending the outcome of this appeal. Therefore, it is impossible for Ratliff to satisfy the prejudice prong set forth in Strickland.
¶ 31. Nevertheless, we find that the record lacks sufficient evidence to adequately address Ratliffs claims at this time. Ratliff claims that he was denied the right to personally meet and consult his appellate counsel. However, we cannot know, from our review of the record, whether Ratliff was able to consult his appellate counsel by other means such as letter correspondence, email, or telephone. The Mississippi Supreme Court has held that “ineffective assistance claims are more appropriately brought during post-conviction proceedings.” Parker v. State, 30 So.3d 1222, 1232 (¶36) (Miss.2010) (quoting Archer v. State, 986 So.2d 951, 955 (¶ 15) (Miss.2008)). As the court explained: “This is because on direct appeal the [appellate court] is limited to the trial court record in its review of the claim.” Therefore, “[w]here the record lacks sufficient evidence to adequately address the claim, [the appellate court] should deny relief, preserving the defendant’s right to argue the issue through a post-conviction-relief petition.” Id. We find that Ratliffs claim of ineffective assistance of appellate counsel is not fully apparent from the record, and therefore, is not ripe for review on direct appeal; however, we preserve Ratliffs right to argue this same issue through a petition for post-conviction relief.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY OF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND TO PAY A $5,000 FINE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
*850 LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR.

. Lindsey v. State, 939 So.2d 743, 748 (¶ 18) (Miss.2005) (implementing procedures governing cases where appellate counsel represents an indigent defendant and does not be-Heve the client’s case presents any issues on appeal).

. We have substituted initials to protect the identity of the minor victim of sexual abuse.

. Nelson Estess was appointed to represent Ratliff at trial; however, upon filing a notice of appeal, Estess withdrew as counsel of record and Ratliff was appointed counsel from the Office of the State Public Defender.